1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10   RASHEEM ABACA,

11              Petitioner,                   No. CIV S-06-0684 MCE CHS P

12        vs.

13   RICHARD SUBIA[1], et al.,

14              Respondents.                  FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.     INTRODUCTION

17              Petitioner Rasheem Abaca, is a state prisoner proceeding pro se with a petition for

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner attacks his conviction in the

19   Lassen County Superior Court, case number CR020026, for kidnaping, penetration with a

20   foreign object, and two counts of forcible rape.

21   II.    CLAIMS

22              Petitioner argues that:

23        A.     The trial court erred by joining the trials of two separate rape charges; and

24   _____

25        [1] Petitioner named Rosanne Campbell, the former warden of Mule Creek State Prison as
     Respondent.  Richard Subia has replaced Campbell as warden.  Federal Rule of Civil Procedure
26   25(d) allows the successor of a public office to automatically be substituted as a party.
     Accordingly the clerk is directed to change the name of Respondent to Richard Subia.

                                                1

B.      The trial court erred by failing to adequately instruct the jury.

Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's petition for habeas corpus relief be denied.

III.    FACTUAL AND PROCEDURAL BACKGROUND

A.      Facts[2]

Prosecution case

In January 2003, 16-year-old M.L. came to the United States from Mexico with her father and sister.  M.L. found work selling strawberries at a stand in Rio Linda.  M.L. has an elementary school education, has never been married, and speaks no English. On a normal day, the strawberry distributor took M.L. to the stand by 11:00 a.m., where she would sell strawberries alone for the day, and picked her up by 5:00 or 6:00 p.m.

In April 2003, defendant and Marisol Barbero stopped at the stand and defendant bought strawberries.  At the time, Barbero[FN] was working as a prostitute for defendant, whom she described as her pimp.  It was defendant's idea for Barbero to enter prostitution and when she had tried to leave, he became aggressive and threatened to kill her.

> FN.  Barbero testified on behalf of the prosecution pursuant to a grant of immunity.

After leaving the stand, defendant told Barbero he wanted M.L. to work for him.  At defendant's direction, they went back to the strawberry stand that day, where Barbero, who spoke broken Spanish, invited M.L. to dinner and offered her a job.  M.L. said she needed her sister's permission.  Barbero handed M.L. her cellular phone, but the sister denied permission.  Defendant and Barbero left.  By now it was raining or cold and they came back again.  This time M.L. accepted the offer of a ride home because her ride had not arrived.

Instead of taking M.L. home, defendant picked up his father and drove them five hours to his father's house in Herlong.  M.L. had grown very afraid.  At the house, defendant's father went to the living room.  Barbero and defendant went to the bedroom and Barbero told M.L. to sleep with them.  She said, "no."  Defendant made Barbero go into another room.  M.L. pleaded to go with

---

[2] This statement of facts is taken from the February 28, 2005, opinion by the California Court of Appeal for the Third Appellate District, case number C045722 (hereinafter Opinion), lodged with respondent's answer as Lodged Document IV.  These facts have not been rebutted with clear and convincing evidence and must, therefore, be presumed correct.  28 U.S.C. § 2254(e)(1); Taylor v. Maddox, 336 F.3d 992, 1000 (9th Cir. 2004).

2

Barbero but defendant refused.  Defendant left to have a drink with his father and, when he returned, M.L. had moved into the other bedroom with Barbero.  Defendant forced M.L. to return to the first room where he told her that she needed to have sex with him. When she told him "no," defendant repeatedly slapped her on the face.  He then removed her clothes.  M.L. ran out of the room and clutched onto Barbero, who refused to help her.  Defendant foiled M.L.'s escape attempt via a bathroom window.  Again alone with M.L. in the first room, defendant took off his clothes, laid on top of her with an erect penis, licked his finger and put it in her vagina approximately three times.  Screaming, M.L. tried to grab defendant's penis.  Defendant slapped her again.

Defendant decided to take M.L. back to the car.  Defendant laid her down in the back seat, put his finger in her vagina, and despite her efforts to fight him off, put his penis in her vagina.  Defendant took M.L. back to the room, refused to let her get dressed or take a shower, and forced her to lie down on the bed, where she slept.

The next day, defendant told M.L. he would take her home. Instead, he drove her to an abandoned house.  When she tried to get out of the car, he pulled her by the hair and forced her back in. After another struggle, she successfully opened the door and started running. Defendant caught up to her when she fell down. Defendant put his foot on her neck, choked her, and hit her on her mouth and head, causing one of her teeth to discolor.  He repeatedly told her she was stupid.  He put her in the trunk of the car and drove back to his father's house.[FN]  When they arrived, he left her in the trunk but offered her food through a hole in the back seat, which she refused.

    FN. Barbero testified she was at the father's house when the two arrived and M.L. was, indeed, in the trunk of the car.

After five or 10 minutes, defendant drove M.L. back to the abandoned house.  When they arrived, he moved M.L. into the back seat, called her stupid, showed her his fist, and raped her again.  When he was done, he wiped his penis with her underwear and left it at the abandoned house.  He put her back in the trunk and drove two hours to Reno.

When they arrived, defendant moved her to the front seat and said if she talked to police they would take her back to Mexico.[FN] Defendant pulled up along side one Claudia Ramirez who was walking on the sidewalk.  Defendant told Ramirez that M.L. needed help.  Ramirez noticed M.L.'s face was injured.  M.L. got out of the car and told Ramirez that defendant had raped her, hit her, and stolen her money.  As defendant drove away, M.L. wrote down defendant's license plate number.  Ramirez called the police.

    FN. M.L. had entered the United States illegally.

The police took M.L. to the hospital where a physical exam was performed.  M.L. had very slight swelling on her forehead, bruising around her eyes and chin, swelling on her right cheek, redness and bruising on her chest, very faint bruises on her arms, and small scratches on her back.  She had profound bruising on the outside and inside of her vaginal area.  The examining nurse, who was trained to recognize indicia of sexual assault, opined that M.L.'s injuries were consistent with nonconsensual sex.

M.L. was able to show police the location of defendant's father's house, the abandoned house, and the stops she and defendant made in Reno.  Outside the abandoned house, the police found M.L.'s underwear.

Defendant drove back that evening, picked up Barbero, and took her to Reno to work as a prostitute.  Defendant told Barbero he had fought with M.L. and had injured his knuckles when he hit her after she had grabbed his private parts.  While in Reno, they met a girl named E.C. who directed them to the Diamonds Casino where there were a lot of "tricks."  Defendant drove E.C. and Barbero to the casino.  Defendant later dropped off Barbero at the Show Girls parking lot while E.C. remained with defendant in the car.

According to Barbero, after E.C. had spent a few days with defendant, she also became scared of him.  Barbero did not witness events between defendant and E.C., and did not know whether "it" happened because E.C. exaggerates a lot.[3]

A few days after the incidents involving M.L., the police located defendant.  When interviewed by police, defendant said he took M.L. to his father's house because he was going to marry her.  He did not respond when police said that would be ridiculous since he had just met her six hours before.  He said they started having consensual sex in the bedroom and then moved to the car.  He did not respond when the police asked why they would have moved from the bed to the car, as the bed would have been more comfortable.  When confronted with the injuries that M.L. had sustained, defendant admitted hitting M.L.

Defense

Aloda Abaca, defendant's father, Charles Loney, a handyman who visited the duplex in which defendant's father lived, Jerry Johnson, a close childhood friend of defendant's, and John Baros, who lived next door to defendant's father, were present at the father's house with M.L.  M.L. was not injured, did not seem upset, and was not screaming.

Defendant testified that he stopped by the strawberry stand many

[3] Petitioner was charged with raping E.C.  Clerk's Transcripts at 181-86.

4

times that day and decided to help M.L. because she had been working all day.  With Barbero translating, defendant invited M.L. to a "rave" party.  They concocted a story to tell M.L.'s sister.

They drove to his father's house, where they drank alcohol and M.L. put on makeup.  Defendant started flirting with M.L., who returned his affection.  Barbero told him that M.L. was a virgin and that she might become attached to him if they had sex.  Defendant told Barbero, who was jealous, that he was not concerned.  Defendant orally copulated M.L. in a bedroom.  Defendant did not want to have sex with her in the bed because he thought she would bleed.  M.L. agreed to go with him to the car.  They both took their clothes off and engaged in sexual intercourse.  He stopped because she was in pain and bleeding.

The next morning, defendant was in bed talking with Barbero.  M.L. was angry and disappointed when she saw the two of them together.  Defendant wanted to take M.L. home.  He, Barbero, and M.L. drove to Reno.  After unsuccessfully trying to contact M.L.'s father, defendant drove M.L. to a Mexican neighborhood where he dropped her off in the presence of a Spanish-speaking lady so M.L. would have help finding her way home.  Defendant denied putting M.L. in the trunk of his car, hitting her, and driving her to the abandoned house.  M.L. did not look injured while in his presence.  Barbero and M.L. lied during their testimony.  Defendant had been convicted of robbery with a firearm in 1994.

/////

Opinion at 2-8.

On September 23, 2003, a jury found petitioner guilty of kidnaping, penetration with a foreign object, and two counts of forcible rape of M.L.  Reporter's Transcripts ("RT") at 975-77.  On December 7, 2003, the trial judge sentenced petitioner to an aggregate term of 32 years in prison.  Id. at 1003.

B.   Procedural History

Petitioner filed a timely appeal in the California Court of Appeal, Third Appellate District.  See, Answer, Lodged Doc. I.  That court denied his appeal on February 28, 2005, in a reasoned opinion.  Answer, Lodged Doc. IV.

Petitioner then filed a petition for review in the California Supreme Court on March 30, 2005.  Answer, Lodged Doc. V.  That petition was summarily denied on May 11, 2005.  Answer, Lodged Doc. VI.

1    IV.    <u>APPLICABLE STANDARD OF HABEAS CORPUS REVIEW</u>

2              An application for a writ of habeas corpus by a person in custody under a

3    judgment of a state court can be granted only for violations of the Constitution or laws of the

4    United States.  28 U.S.C. § 2254(a).

5              Federal habeas corpus relief is not available for any claim decided on the merits

6    in state court proceedings unless the state court's adjudication of the claim:

7              (1) resulted in a decision that was contrary to, or involved an
               unreasonable application of, clearly established federal law, as
8              determined by the Supreme Court of the United States; or

9              (2) resulted in a decision that was based on an unreasonable
               determination of the facts in light of the evidence presented in the
10             State court proceeding.

11   28 U.S.C. § 2254(d).

12             Although "AEDPA does not require a federal habeas court to adopt any one

13   methodology," Lockyer v. Andrade, 538 U.S 63, 71 (2003), there are certain principles which

14   guide its application.

15             First, the "contrary to" and "unreasonable application" clauses are different.  As

16   the Supreme Court has explained:

17             A federal habeas court may issue the writ under the "contrary to"
               clause if the state court applies a rule different from the governing
18             law set forth in our cases, or if it decides a case differently than we
               have done on a set of materially indistinguishable facts.  The court
19             may grant relief under the "unreasonable application" clause if the
               state court correctly identifies the governing legal principle from
20             our decisions but unreasonably applies it to the facts of the
               particular case.  The focus of the latter inquiry is on whether the
21             state court's application of clearly established federal law is
               objectively unreasonable, and we stressed in Williams [v. Taylor,
22             529 U.S. 362 (2000)] that an unreasonable application is different
               from an incorrect one.

23   /////

24   Bell v. Cone, 535 U.S. 685, 694 (2002).  It is the habeas petitioner's burden to show the state

25   court's decision was either contrary to or an unreasonable application of federal law.  Woodford

26   v. Visciotti, 537 U.S. 19, 123 S. Ct. 357, 360 (2002).  It is appropriate to look to lower court

1  decisions to determine what law has been "clearly established" by the Supreme Court and the

2  reasonableness of a particular application of that law.  See Duhaime v. Ducharme, 200 F.3d 597,

3  598 (9th Cir. 2000).

4          Second, the court looks to the last reasoned state court decision as the basis for

5  the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  So long as the

6  state court adjudicated petitioner's claims on the merits, its decision is entitled to deference, no

7  matter how brief.  Lockyer, 538 U.S. at 76; Downs v. Hoyt, 232 F.3d 1031, 1035 (9th Cir. 2000).

8          Third, in determining whether a state court decision is entitled to deference, it is

9  not necessary for the state court to cite or even be aware of the controlling federal authorities "so

10 long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v.

11 Packer,  537  U.S. 3, 8 (2003).  Moreover, a state court opinion need not contain "a formulary

12 statement" of federal law, so long as the fair import of its conclusion is consonant with federal

13 law.  Id.

14 V.     DISCUSSION OF PETITIONER'S CLAIMS

15        A.     Joinder

16               1)     Description of Claim

17          At the outset of trial petitioner was charged with two counts of raping M.L. and

18 one count of raping E.C.  Clerk's Transcripts ("CT") at 181-86.  Petitioner moved to sever the

19 trial of the rape charge involving E.C. from the trial on the charges involving M.L., arguing that

20 the crimes involved different victims, were committed at different times, and were accomplished

21 by different means.  RT at 6-7.  The trial court denied that motion finding that "the factual

22 circumstances are such as to involve one course of events over a very short time with cross

23 admissibility and [are] properly joined for trial."  Id. at 13.

24          When E.C. was called to testify however she asserted her Fifth Amendment

25

26

7

privileges and refused to testify.[4]  Id. at 271.  At the end of the prosecution's case in chief, and in front of the jury, the trial judge granted the prosecutor's request to dismiss the rape charge involving E.C.  Id. at 454-55; CT at 186.

Petitioner argues that the jury was "poisoned by the accusation that [he] had committed another rape" and therefore that the trial court violated his right to a fair trial by denying the motion to sever.  Petition at 18-21.

2)   State Court Opinion

The California Court of Appeal rejected this claim stating:

Section 954 permits two or more offenses of the same class to be consolidated for trial.  Because the law favors consolidation of charges (People v. Ochoa (2001) 26 Cal.4th 398, 423), where the statutory requirements for joinder have been met, defendant can demonstrate error in the denial of a motion to sever only by a clear showing of potential prejudice.  (Id. at p. 423; People v. Mendoza (2000) 24 Cal.4th 130, 160; People v. Musselwhite (1998) 17 Cal.4th 1216, 1243-1244.)

When a trial court's denial of severance was correct when made, reversal of the judgment is warranted only if "a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law."  (People v. Turner (1984) 37 Cal.3d 302, 313.)  In this examination, we look to see whether it is "reasonably probable" the jury was influenced in its verdict of guilt of the crimes involving M.L. by its knowledge of defendant's involvement in the alleged rape of E.C.  (People v. Bean (1988) 46 Cal.3d 919, 940.)

The trial evidence that defendant perpetrated the crimes against M.L. was so overwhelming that it is not "reasonably probable" the guilty verdicts on those charges were influenced by the jury's knowledge of defendant's involvement in the alleged rape of E.C. M.L .'s version of events was corroborated by her physical injuries and extensive bruising to her vaginal area, which appeared consistent with non-consensual sex.  Defendant's testimony that M.L. was not injured in his presence was dispelled by Rodriguez's testimony that M.L. appeared injured when she saw M.L. with defendant and by defendant's own admission to police officers that he had hit M.L.  Moreover, Barbero corroborated M.L.'s testimony that the sex was not consensual as Barbero heard M.L. say she did not want to have sex with defendant and witnessed her in the trunk

---

[4] The trial court denied a request for a grant of immunity.  RT at 271-283.

1    of defendant's car.

2    In stark contrast to the strength of evidence relating to the offenses
     involving M.L., the evidence of the alleged rape against E.C. was
3    de minimus.  Barbero testified she thought E.C. was scared of
     defendant, but did not know if "it" happened because E.C.
4    exaggerates.  No doubt because the evidence defendant had raped
     E.C. was lacking, in large part because E.C. refused to testify
5    without a grant of immunity from other jurisdictions, the
     prosecution in front of the jury moved to dismiss the rape charge
6    relating to E.C.

7    Finally, unlike People v. Grant (2003) 113 Cal.App.4th 579 at
     pages 593 through 594, which defendant cites in support of his
8    argument, in this case neither the People's closing argument nor
     the trial court's instructions encouraged the jurors to infer that
9    defendant was guilty of the crimes involving M.L. because he was
     charged and/or involved with the rape of E.C.

10
                                         * * *
11

12   On this record, we conclude the joinder of the rape charge
     involving E.C. and the failure to instruct pursuant to CALJIC No.
13   17 .46 do not require reversal.

14   Opinion at 10-13.

15            3)      Applicable Law

16        A court may grant habeas relief based on a state court's decision to deny a motion

17   for severance only if the joint trial was so prejudicial that it denied a petitioner his right to a fair

18   trial.  Zafiro v. United States, 506 U.S. 534, 538-39 (1993) (court must decide if "there is a

19   serious risk that a joint trial would compromise a specific trial right of one of the defendants, or

20   prevent the jury from making a reliable judgment about guilt or innocence"); United States v.

21   Lane, 474 U.S. 438, 446 n.8 (1986) ("misjoinder would rise to the level of a constitutional

22   violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right

23   to a fair trial"); Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991) (same).  Petitioner

24   bears the burden of proving that the denial of severance rendered his trial fundamentally unfair,

25   Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997), and must establish that prejudice arising

26   from the failure to sever was so "clear, manifest, and undue" that he was denied a fair trial.

                                              9

1  Lambright v. Stewart, 191 F.3d 1181, 1185 (9th Cir. 1999) (quoting United States v.

2  Throckmorton, 87 F.3d 1069, 1071-72 (9th Cir. 1996)).  See also United States v. Cruz, 127 F.3d

3  791, 798 (9th Cir. 1997) (moving party must demonstrate that the joint trial impinged on a

4  fundamental trial right or compromised the fairness of the proceedings in a tangible way).

5              On habeas review, federal courts neither depend on the state law governing

6  severance in state trials, Grisby, 130 F.3d at 370 (citing Hollins v. Dep't of Corrections, State of

7  Iowa, 969 F.2d 606, 608 (8th Cir. 1992)), nor consider procedural rights to a severance afforded

8  to criminal defendants in the federal criminal justice system.  Id.  Rather, the relevant question is

9  whether the state proceedings satisfied due process.  Id.; see also Cooper v. McGrath, 314

10  F. Supp. 2d 967, 983 (N.D. Cal. 2004).

11              4)     Discussion

12              The Ninth Circuit has recognized that the risk of undue prejudice is particularly

13  great whenever joinder of counts allows evidence of other crimes to be introduced in a trial

14  where the evidence would otherwise be inadmissible.  Sandoval v. Calderon, 241 F.3d 765, 772

15  (9th Cir. 2000); United States v. Lewis, 787 F.2d 1318, 1322 (9th Cir. 1986).  Undue prejudice

16  may also arise from the joinder of a strong evidentiary case with a weaker one.  See id.  The

17  reason there is danger in both situations is that it is difficult for a jury to compartmentalize the

18  damaging information.  Sandoval, 241 F.3d at 772.

19              The evidence supporting petitioner's guilt of the crimes against M.L. was

20  substantial.  At trial, M.L. testified about the crimes petitioner perpetrated against her, which

21  included multiple incidents of rape.  RT at 57-106.  M.L.'s testimony was corroborated by Ms.

22  Barbero's testimony.  Id. at 174-205.  M.L.'s testimony was further corroborated by her physical

23  injuries which included bruises, scratches and red marks throughout her body, as well as bruises,

24  swelling, redness, scratches, and lacerations to her vaginal area.  Id. at 309-14.  The jury was told

25  that the injuries were "consistent with non-consensual sex."  Id. at 315.  Petitioner admitted to

26  having sex with M.L. but claimed the encounter was consensual.  Id. at 743.

1    Conversely, the evidence of the rape of E.C. was scant, presumably because E.C.

2  refused to testify.  Id. at 271.  Ms. Barbero testified that she thought E.C. was scared of petitioner

3  but didn't know if "it" (meaning rape) actually occurred because E.C. "exaggerates."  Id. at 211.

4  Petitioner does not argue that any of the evidence presented concerning the rape of E.C. was

5  inadmissible.

6    There is no reason to believe that the jury's verdict would have been different had

7  the severance been granted because the evidence of petitioner's guilt as to the counts of rape

8  against M.L. was significant.  The jury was presented with testimony from the victim who

9  described in detail the events surrounding her rape by petitioner.  That testimony was supported

10  by another witness, petitioner's prostitute, as well as the physical evidence of sexual assault.  In

11  the face of such evidence, it is unlikely the jury was influenced to any degree by the mere

12  knowledge that petitioner had been charged with another count of rape that was dismissed prior

13  to the jury's deliberations.

14    Petitioner has not proven that the denial of severance rendered his trial

15  fundamentally unfair and therefore he is not entitled to relief on this claim.

16    B.    Jury Instruction

17        1)    Description of Claim

18    Part of petitioner's argument concerning misjoinder is that the trial court erred by

19  not instructing the jury pursuant to CALJIC No. 17.46.  CALJIC No. 17.46 states:

20        The issue of the guilt of the defendant[s] as to [Count[s] ... ] is no
         longer before you. [¶] Do not consider this fact for any purpose. It
21        is not relevant to whether the defendant[s][is][are] guilty or not
         guilty of any remaining count[s]. [¶] Further, do not conclude from
22        the fact that this instruction has been given that I am expressing
         any opinion as to the facts or whether [any] defendant is guilty or
23        not guilty of any other crime[s].

24  Petitioner argues that by failing to admonish the jury the trial court allowed the "dismissed count

25  to loom[] over the jury as inadmissible evidence of [his] propensity to commit rape."  Petition at

26  21.

1     2)     State Court Opinion

2     The California Court of Appeal rejected this claim stating:

3     While defendant claims the court should have instructed pursuant
      to CALJIC No. 17.46, he never requested the instruction.
4     Moreover, the given instructions admonished the jury to not be
      biased against defendant because he had been charged with a crime
5     or brought to trial, that none of these circumstances was evidence
      of guilt (CALJIC No. 1.00), that defendant was presumed
6     innocent, and that the People had the burden of proving him guilty
      beyond a reasonable doubt (CALJIC No. 2 .90).  It was not
7     reasonably likely that the instructions viewed as a whole violated
      defendant's rights.  (See People v. Davison (1995) 32 Cal.App.4th
8     206, 212, citing People v. Warren (1988) 45 Cal.3d 471, 487 and
      People v. McPeters (1992) 2 Cal.4th 1148, 1191.)
9
      On this record, we conclude the joinder of the rape charge
10    involving E.C. and the failure to instruct pursuant to CALJIC No.
      17 .46 do not require reversal.
11    /////

12    Opinion at 13.

13    3)     Applicable Law

14          Generally, claims of error in state court jury instructions are a matter of state law

15    and do not invoke a constitutional question.  Hayes v. Woodford, 301 F.3d 1054, 1086 n. 38 (9th

16    Cir. 2002).  The fact that an instruction was allegedly incorrect under state law is not a basis for

17    habeas relief.  Estelle v. McGuire, 502 U.S. 62, 71-73 (1991).  Thus, to obtain relief based on a

18    charge to the jury, a petitioner must establish not merely that the instruction was undesirable,

19    erroneous, or even universally condemned, but that it violated some right which was guaranteed

20    to the petitioner by the Fourteenth Amendment.  Cupp v. Naughten, 414 U.S. 141, 146 (1973).

21    That is, the central inquiry is whether the instruction in question so infected the entire trial that

22    the resulting conviction violates due process.  Id. at 147.

23          As with a claim that a trial court erred in *giving* a particular instruction, a claim

24    that a court erred in *omitting* an instruction requires a showing that the error so infected the

25    entire trial that the resulting conviction violated due process.  Henderson v. Kibbe, 431 U.S. 145,

26    154 (1977).  However, in such cases, the petitioner's burden is especially heavy, as an omission

12

1  is less likely to be prejudicial than an affirmative misstatement of the law.  Id. at 155.  Failure to

2  give a jury instruction which might be proper as a matter of state law does not, by itself, merit

3  federal habeas relief.  Miller, supra, 757 F.2d at 993.  Further, "[t]he necessity, extent and

4  character of additional instructions are matters within the sound discretion of the trial court."

5  Wilson v. United States, 422 F.2d 1303, 1304 (9th Cir.1970).

6             4)     Discussion

7             When the trial judge asked petitioner's counsel if he had any objections to the

8  proposed jury instructions, he answered no.  RT at 870.  When the trial judge asked petitioner's

9  counsel if he had any requests for instructions that had not been proposed, he answered no.  Id.

10 The trial judge went on to instruct the jury that petitioner was presumed to be innocent and that

11 the prosecution had the burden of proving him guilty beyond a reasonable doubt.  RT at 891.

12            There is no evidence of record that the omission of the instruction altered the

13 jury's deliberations.  Petitioner never requested CALJIC No. 17.46 and has failed to show that its

14 omission was an error, let alone that its omission "so infected the entire trial that the resulting

15 conviction violated due process."  Petitioner is therefore not entitled to relief on this claim.

16 /////

17 /////

18 VI.    CONCLUSION

19            Accordingly, IT IS RECOMMENDED that petitioner's petition for a writ of

20 habeas corpus be denied.

21            These findings and recommendations are submitted to the United States District

22 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

23 days after being served with these findings and recommendations, any party may file written

24 objections with the court and serve a copy on all parties.  Such a document should be captioned

25 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

26 shall be served and filed within ten days after service of the objections.  The parties are advised

1  that failure to file objections within the specified time may waive the right to appeal the District

2  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3  DATED: August 11, 2009

4  *Charlene H. Sorrentino*

5  CHARLENE H. SORRENTINO
   UNITED STATES MAGISTRATE JUDGE

14